Slip Op. 09-79

# UNITED STATES COURT OF INTERNATIONAL TRADE

|   |   |
|---|---|
| BRIDGESTONE AMERICAS, INC., BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC, and TITAN TIRE CORPORATION, | : : : : : |
| Plaintiffs, | : : |
| v. | : Before: Jane A. Restani, Chief Judge : |
| UNITED STATES, | : Consol. Court No. 08-00256 : |
| Defendant, | : **Public Version** : |
| and | : : |
| XUZHOU XUGONG TYRES CO., LTD. | : : |
| Defendant-Intervenor. | : : |

## OPINION

[Plaintiffs Bridgestone Americas, Inc. and Bridgestone Americas Tire Operations, LLC's motion for judgment on the agency record granted in part. Plaintiff Titan Tire Corporation's motion for judgment on the agency record granted in part. Remand to Department of Commerce to reconsider treatment of inputs as indirect materials.]

Dated: August 4, 2009

   King & Spalding, LLP (Joseph W. Dorn, Daniel L. Schneiderman, and J. Michael Taylor) for plaintiffs Bridgestone Americas, Inc. and Bridgestone Americas Tire Operations, LLC.

   Stewart and Stewart (Wesley K. Caine) for plaintiff Titan Tire Corporation.

   Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (John J. Todor and Loren Misha Preheim); Irene H. Chen and David Richardson, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for the defendant.

Consol. Court No. 08-00256                                                                                         Page 2

        White & Case, LLP (Adams C. Lee and Frank H. Morgan) for the defendant-intervenor.

        Restani, Chief Judge: This matter is before the court on the motions of plaintiffs Bridgestone Americas, Inc. and Bridgestone Americas Tire Operations, LLC (collectively, "Bridgestone") and Titan Tire Corporation ("Titan") for judgment on the agency record pursuant to USCIT Rule 56.2. Plaintiffs, domestic producers of certain off-the-road ("OTR") tires, contest the Department of Commerce's ("Commerce") exclusion of defendant-intervenor Xuzhou Xugong Tyres Co., Ltd. ("Xugong"), a Chinese producer of OTR tires, from the scope of a final antidumping ("AD") determination. See Certain New Pneumatic Off-The-Road-Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 Fed. Reg. 40,485 (Dep't Commerce July 15, 2008) ("Final Determination"). Bridgestone and Titan contest Commerce's determination that fifteen of the raw material inputs Xugong used in producing the tires were indirect materials. Titan also contests Commerce's refusal to include the amount of value-added tax ("VAT") that Xugong paid in acquiring inputs to produce the tires, but was not refunded by the Chinese government, in Xugong's normal value calculation.[1] Xugong opposes the motions. Commerce opposes Titan's motion as to the unrefunded VAT but seeks a remand to reconsider and explain its decision as to the fifteen inputs.[2] For the following reasons,

---

[1] Bridgestone initially joined in this argument but has abandoned it. (See Order of Partial Dismissal (June 2, 2009); Partial Consent Mot. for Partial Dismissal.) Bridgestone has also abandoned its argument that Commerce should have applied "zeroing" in calculating Xugong's dumping margin. (See Order of Partial Dismissal; Partial Consent Mot. for Partial Dismissal.)

[2] Without "confess[ing] error," Commerce requested a voluntary remand to "reconsider
(continued...)

Consol. Court No. 08-00256                                                    Page 3

Bridgestone's motion will be granted in part and denied in part, and Titan's motion will be granted in part and denied in part.

## BACKGROUND

In July 2007, Commerce initiated an AD investigation to determine whether imports of certain pneumatic OTR tires from the People's Republic of China for the period of October 1, 2006 through March 31, 2007, were being sold in the United States at less than fair value. See Initiation of Antidumping Duty Investigation: Certain New Pneumatic Off-the-Road Tires From the People's Republic of China, 72 Fed. Reg. 43,591 (Dep't Commerce Aug. 6, 2007). Commerce selected Xugong as a mandatory respondent. Certain New Pneumatic Off-The-Road Tires From the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 73 Fed. Reg. 9278, 9282–83 (Dep't Commerce Feb. 20, 2008) ("Preliminary Determination").[3] In a preliminary determination, Commerce calculated a dumping margin of 51.81% for Xugong. Id. at 9291.

After the preliminary determination, Commerce issued Xugong a supplemental

---

[2](...continued)
and give further explanation for its decision." (Def.'s Resp. to Pls.' Mot. for J. upon the Administrative R. ("Government's Resp. Br.") 28.) The court denied the request pending full briefing. (See Order (May 19, 2009).)

[3] The other mandatory respondents were Guizhou Tyre Co., Ltd., Hebei Starbright Co., Ltd., and Tianjin United Tire & Rubber International Co., Ltd. Id. at 9278 n.3, 9283. Those respondents were also mandatory respondents in an accompanying countervailing duty ("CVD") investigation. See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances, 73 Fed. Reg. 40,480, 40,483 (Dep't Commerce July 15, 2008). Currently pending before the court are challenges to the final AD and CVD determinations as they relate to those separate respondents. See GPX Int'l Tire Corp. v. United States, Consol. No. 08-00285.

Consol. Court No. 08-00256                                                                    Page 4

questionnaire requesting clarifying information and an updated factors of production ("FOP") database for the purpose of calculating normal value to compare with the United States price.[4] (See Xugong's Fifth Supplemental Questionnaire Resp. ("Fifth Supplemental Questionnaire"), Exs. Accompanying the Resp. Br. of Xugong ("Xugong's App.") Tab 1.) In addition to providing the requested information, Xugong informed Commerce that fifteen of the raw material inputs it previously reported as direct materials were in fact indirect materials, as they were used for "cleaning or supplemental purpose[s] in the production process," and included the corrections in the updated database. (Fifth Supplemental Questionnaire 4, Xugong's App. Tab 1.) Commerce had treated the fifteen inputs as direct materials in calculating the preliminary dumping margin. (See Surrogate Value Memorandum, A-570-912, POR 10/01/06-3/31/07, at 3 n.6 (Feb. 5, 2008), Xugong's App. Tab 12.) Although Bridgestone requested that Commerce "verify that . . . each of [the fifteen] inputs is properly treated as overhead and cannot be reported as a direct input" (Pre-Verification Comments 4, Xugong's App. Tab 3), Commerce's verification report does not discuss the nature of the inputs (see Verification Report, Xugong's App. Tab 4).[5] In their case briefs submitted after verification, none of the

---

[4] Dumping occurs when a foreign manufacturer sells foreign goods in the United States at less than the fair market value of the goods in the foreign country. See 19 U.S.C. §§ 1673, 1677(34); AIMCOR v. United States, 141 F.3d 1098, 1101 (Fed. Cir. 1998). Where dumping causes or threatens material injury to a domestic industry, an AD duty is imposed upon the dumped merchandise. See 19 U.S.C. § 1673. The AD duty assessed is "an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673; see AIMCOR, 141 F.3d at 1101 (stating that dumping margin is "the amount by which the foreign market value of the goods exceeds their United States price.")

[5] Commerce, however, conferred with Xugong regarding the use of one of the inputs,
                                                                                    (continued...)

Consol. Court No. 08-00256                                                                                   Page 5

parties addressed the issue of whether the fifteen inputs were direct or indirect materials.  In its case brief, however, Titan did argue that Commerce should have included in normal value the amount of VAT that the Chinese producers had paid to acquire inputs in producing the goods but which the Chinese government had not refunded.  (Pet'r's Case Br. ("Titan's Case Br.") 13–19, App. in Supp. of Defs.' Resp. to Pls.' Mot. for J. Upon the Administrative R. Tab 3.)

In July 2008, Commerce published a final determination, calculating a zero dumping margin for Xugong.  Final Determination, 73 Fed. Reg. at 40,488.  In its calculations, Commerce did not include unrefunded VAT in Xugong's normal value because its surrogate value methodology did not rely on Chinese prices and costs.  Issues and Decision Memorandum for the Antidumping Investigation of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China, A-570-912, POR 10/1/2006-3/31/2007, at 21 (July 7, 2008), available at http://ia.ita.doc.gov/frn/summary/PRC/E8-16156-1.pdf ("Issues and Decision Memorandum").  Commerce also reasoned that the normal value was already tax neutral and therefore no adjustment for unrefunded VAT was warranted.  Id.  Commerce did not address the nature of the fifteen inputs in its issues and decision memorandum, but in a separate memorandum calculating Xugong's final dumping margin, it stated: "Because there is no evidence that these raw materials are direct materials, we have treated all 15 inputs as indirect materials and excluded them from the calculation of the normal value."  (Analysis Memorandum

---

[5](...continued)
[[          ]], but it was to determine how Xugong recorded purchases of certain inputs, not to verify the nature of the fifteen inputs at issue here.  (See Verification Report 22, Xugong's App. Tab 4.)

*Confidential Data Deleted*

Consol. Court No. 08-00256                                                                                      Page 6

for the Final Determination: Xuzhou Xugong Tyres Co., Ltd., A-570-912, POR 10/01/06-3/31/07, at 3 (July 7, 2008) ("Final Analysis Memorandum"), App. of Docs. Cited in Bridgestone's Br. in Supp. of Mot. for J. on the Agency R. ("Bridgestone's App.") Tab 21.)

        Thereafter, Bridgestone and Titan submitted comments, contending that Commerce's treatment of the fifteen inputs as indirect materials was a "ministerial error." (Comments Regarding Ministerial Errors In The Final Margin Calculations For Xugong 2–12, Bridgestone's App. Tab 26.) Commerce rejected the contention.[6] (Final Determination of Antidumping Duty Investigation on Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Allegations of Ministerial Errors, A-570-912, POR 10/01/06-03/31/07, at 7 (Aug. 14, 2008) ("Ministerial Errors Memorandum"), Bridgestone's App. Tab 27.) Bridgestone and Titan then commenced separate actions, challenging Commerce's exclusion of Xugong from the final determination. (Titan's Compl ¶ 1; Bridgestone's Compl. ¶ 1.) Xugong intervened in both (Order (No. 08-00258) (Sept. 25, 2008); Order (No. 08-00256) (Sept. 23, 2008)), and the actions were consolidated (Order (Dec. 22, 2008)).

        Bridgestone and Titan now move for judgment on the agency record pursuant to USCIT Rule 56.2. Both contend that Commerce's treatment of the fifteen inputs as indirect materials was unsupported by substantial evidence and not in accordance with law and that substantial evidence actually shows that the inputs were direct materials. (Bridgestone's Br. in

---

    [6] In an amended final determination accounting for other unrelated ministerial errors, Xugong's dumping margin remained at zero. Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 73 Fed. Reg. 51,624, 51,625 (Dep't Commerce Sept. 4, 2008).

Consol. Court No. 08-00256 Page 7

Supp. of Mot. for J. on the Agency R. ("Bridgestone's Br.") 13–25, 31; Br. of Titan in Supp. of Mot. for J. Upon the Agency R. ("Titan's Br.") 14–22.) Titan also argues that Commerce's refusal to include the amount of unrefunded VAT in Xugong's normal value calculation was unsupported by substantial evidence and not in accordance with law. (Titan's Br. 12–14, 22.) Bridgestone and Titan request that the court remand the matter with instructions directing Commerce to reclassify the fifteen inputs as direct materials and to recalculate Xugong's dumping margin accordingly. (Bridgestone's Br. 31; Titan's Br. 22–23.) Bridgestone additionally requests that the court instruct Commerce to value thirteen of the inputs as it had valued them in the preliminary determination and, with respect to the remaining two, to consider the proper Harmonized Tariff Schedule ("HTS") classification to use in valuing them.[7] (Bridgestone's Br. 31.) Titan also requests that the court direct Commerce to include unrefunded VAT in the recalculation. (Titan's Br. 22–23.)

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(c). The court must uphold Commerce's final determination in an AD investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Commerce's findings must be reached by reasoned decision-making,

---

[7] The two inputs are [[                          ]]. (Bridgestone's Confidential Br. 3.) In their joint case brief, Bridgestone and Titan contended that Commerce should apply HTS [[       ]] and HTS [[       ]] in calculating the final dumping margin, as opposed to HTS [[    ]] and HTS [[    ]], which Commerce applied in the preliminary determination. Commerce did not address the issue because it decided that it did not need to value the inputs.

*Confidential Data Deleted*

Consol. Court No. 08-00256 Page 8

including a reasoned explanation supported by a stated connection between the facts found and the choice made." Rhodia, Inc. v. United States, 185 F. Supp. 2d 1343, 1349 (CIT 2001) (internal quotation marks, citations, and alteration omitted).

## DISCUSSION

I. **Direct/Indirect Materials**

   A. *Procedural Issues*

Titan argues that Commerce's change of position as to the treatment of the fifteen inputs in the final determination was not in accordance with law because Xugong's case brief did not contest Commerce's treatment of the inputs as direct materials in the preliminary determination and Titan therefore did not have an opportunity to rebut Xugong's corrections. (Titan's Br. 18–19.) Titan argues that under 19 C.F.R. § 351.309(c)(2), Xugong was required to raise the issue so that Titan was afforded notice and an opportunity to be heard. (Id. at 18–22). Titan's reliance on 19 C.F.R. § 351.309(c)(2) is misplaced.

Interested parties in an AD investigation may submit case briefs after publication of a preliminary determination to raise arguments that the parties want Commerce to consider before it renders a final determination. See 19 C.F.R. § 351.309(c)(1)(i). Under 19 C.F.R. § 351.309(c)(2), the case briefs "must present all arguments that continue in the submitter's view to be relevant to [Commerce's] final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results." Id. § 351.309(c)(2). Titan claims that the requirement to "present all arguments" precluded Commerce from changing its position "outside normal briefing procedures when [Titan] could have briefed [the issue of the nature of the fifteen inputs] and thereby subjected it to full

Consol. Court No. 08-00256                                                                    Page 9

examination." (Titan's Br. 19.)  Titan contends that <u>Corus Staal BV v. United States</u>, 502 F.3d 1370 (Fed. Cir. 2007), <u>Nakornthai Strip Mill Public Co. v. United States</u>, 558 F. Supp. 2d 1319 (CIT 2008), and <u>Ta Chen Stainless Steel Pipe, Ltd. v. United States</u>, 342 F. Supp. 2d 1191 (CIT 2004) support its assertion that adherence to 19 C.F.R. § 351.309(c)(2) is essential to fair procedure.  (<u>Id.</u> at 19–20.)  These cases, however, state that the requirement to present all arguments is to ensure that parties have exhausted their administrative remedies.  <u>See</u> <u>Corus</u>, 502 F.3d at 1378; <u>Nakornthai</u>, 558 F. Supp. 2d at 1329; <u>Ta Chen</u>, 342 F. Supp. 2d at 1205–06.  The doctrine of administrative exhaustion "requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court." <u>Timken Co. v. United States</u>, 201 F. Supp. 2d 1316, 1340 (CIT 2002).

Here, Titan is not arguing that Xugong is barred from asserting that the fifteen inputs were indirect materials because Xugong failed to present that position to Commerce and Commerce therefore did not have an opportunity to consider it.  In fact, Xugong had presented it, and Commerce had considered it.  (<u>See</u> <u>Final Analysis Memorandum</u> at 3, Bridgestone's App. Tab 21.)  Rather, Titan is contending that Commerce's adoption of Xugong's position was procedurally unfair because Titan did not have notice of the position and therefore did not have an opportunity to rebut the position.  Titan does not cite any authority for the proposition that 19 C.F.R. § 351.309(c)(2) is intended to afford notice and opportunity to be heard such that a private party may rely on it to bar another's judicial challenge.  In any event, the record shows that Titan had notice of Xugong's submissions and could have challenged them.

Subject to time limitations, parties are entitled to submit corrected information, as acceptance of corrections effectuate "the overarching principle of the antidumping statute, that

Consol. Court No. 08-00256                                                                    Page 10

is, to determine dumping margins as accurately as possible." Timken U.S. Corp. v. United States, 318 F. Supp. 2d 1271, 1277–79 (CIT 2004) (permitting respondent to submit previously misclassified home market sales after preliminary determination in tenth administrative review); see also Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,327 (Dep't Commerce May 19, 1997) ("Prior to the deadline for submission of factual information, the Department's practice normally is to accept a respondent's correction of an error in its own data because the Department has time to review, analyze, and where applicable, verify the corrected data."). Here, Xugong timely submitted the corrections. Pursuant to 19 C.F.R. § 351.301(b)(1), the deadline to submit new factual information was March 18, 2008, seven days before the start of verification of another mandatory respondent. (Notifications Regarding Deadline for New Factual Information, Xugong's App. Tab 2.) Xugong submitted the corrected information on March 11, 2008. (Letter accompanying Fifth Supplemental Questionnaire, Xugong's App. Tab 1.) Commerce did not begin verification of Xugong until April 1, 2008. (Verification Report 1, Xugong's App. Tab 4.)

    Undermining Titan's claim of lack of notice is the fact that Bridgestone was aware of the corrected information and had requested that Commerce ascertain the nature of the fifteen inputs at verification. (See Pre-Verification Comments 4, Xugong's App. Tab 3.) Also, Titan could have expected that Commerce would treat the fifteen inputs as indirect materials. Before verification, Commerce informed Xugong that it would examine "the most recent . . . [FOP] databases reported." (Verification Agenda 4, Bridgestone's App. Tab 13.) After verification and before filing of the case briefs, Commerce requested that Xugong correct certain information and submit a revised FOP database. (See Re-submission of Revised Databases,

Xugong's App. Tab 7.)  Nothing in the record indicates that Commerce had ever requested Xugong to reclassify any of the fifteen inputs as direct inputs.

　　　　　Titan also could have objected to Xugong's corrections.  Interested parties "may submit factual information to rebut, clarify, or correct factual information submitted by any other interested party."  19 C.F.R. § 351.301(c)(1).  At a minimum, like Bridgestone, Titan could have requested that Commerce verify the nature of the inputs.  To the extent that Titan may argue that such a request would be futile, as Commerce did not address the issue in its verification report, Titan could have sought further clarification as to Commerce's position.  <u>See</u> <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. at 27,332 ("Parties are free to comment on verification reports and to make arguments concerning information in the reports up to and including the filing of case and rebuttal briefs.")  Given the record, Titan cannot claim that it was not afforded notice or opportunity to be heard.

　　　　　Bridgestone and Titan also argue that Xugong abandoned its position with respect to two of the inputs.  Specifically, they contend that Xugong's insistence that Commerce use the same HTS classifications as those used in the preliminary determination, and its failure to argue that HTS classification was not necessary for indirect materials, in its rebuttal brief constituted an implicit admission that the two inputs were direct materials. (Bridgestone's Br. 23–24; Titan's Br. 21–22); <u>see</u> <u>supra</u> note 7.  It is true that Xugong insisted that Commerce continue using the same HTS classifications, but Xugong explained that it was merely rebutting Bridgestone and Titan's argument regarding the selection of surrogate values. (<u>See</u> <u>Ministerial Error Memorandum</u> at 7, Bridgestone's App. Tab 27; Xugong's Rebuttal Case Br. 27–29, Bridgestone's App. Tab 18.)  Xugong never explicitly disavowed its position as to the inputs.

Consol. Court No. 08-00256                                                                      Page 12

Given the lack of evidence of intentional relinquishment of the claim, the court does not conclude that Xugong had abandoned its position as to the two inputs. See Former Employees of Quality Fabricating, Inc. v. United States Dep't of Labor, 343 F. Supp. 2d 1272, 1287–88 (CIT 2004) (holding that plaintiffs did not abandon claim merely by opposing motion for voluntary remand absent evidence of intentional relinquishment or abandonment). Further, looking at the circumstances as a whole, Xugong reasonably could have concluded that Commerce had accepted its corrections as part of the record, and it would be unreasonable to assume that Xugong abandoned a position that would have seemed to it to have been decided in its favor.

      B.      *Sufficiency of the Evidence*

Bridgestone and Titan argue that Commerce's treatment of the inputs as indirect materials is unsupported by substantial evidence, and that the court should remand the matter to Commerce for recalculation of the dumping margin. (Bridgestone's Br. 16–24; Titan's Br. 14–18.) They further contend that the court should instruct Commerce to treat the inputs as direct materials because substantial evidence shows that they were direct in nature. (Bridgestone's Br. 18–24; Titan's Br. 14–18.)

Here, the only evidence on the record that could support Commerce's determination is Xugong's claim that it used the fifteen inputs for "cleaning or supplemental" purposes. (Fifth Supplemental Questionnaire 4, Xugong's App. Tab 1.) This statement, however, is conclusory, and Xugong did not provide any further information as to the use of the inputs. Further, Commerce did not cite cleaning or supplemental purposes as a reason for its treatment of the inputs. The only explanation it provided is that "there is no evidence that these raw materials are direct materials." (Final Analysis Memoradum at 3, Bridgestone's App. Tab

Consol. Court No. 08-00256 Page 13

21.) Accordingly, the court cannot conclude that the record provides substantial evidence supporting Commerce's determination. The court also cannot conclude that Commerce's rationale was "a reasoned explanation supported by a stated connection between the facts found and the choice made." Rhodia, 185 F. Supp. 2d at 1349. Indeed, Commerce itself admits that it "ha[d] not fully explained its reasons for treating the[] raw material inputs as indirect materials" and requested a remand to "reconsider its decision and address certain information on the record relating to the raw material inputs in question and provide a reasoned explanation for [its] actions." (Government's Resp. Br. 28.)

The court, however, disagrees with Bridgestone and Titan that substantial evidence shows that the inputs were direct materials. The record does not provide information sufficient for the court to determine how the inputs were used in the production process. As to the contention that Commerce treated certain of the fifteen inputs as direct materials in calculating the dumping margin for the other respondents, the court cannot discern whether these inputs are in fact the same materials and, even if so, whether they were used in the same manner by those respondents. As "factual determinations supporting anti-dumping margins are best left to the agency's expertise," F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000), it would be more appropriate to let Commerce determine the nature of each of the fifteen inputs.[8] On remand, Commerce should reconsider the nature of

---

[8] Bridgestone argues that there is a presumption that inputs are direct materials unless affirmative evidence shows otherwise, and suggests that the presumption applies here because Xugong failed to meet its burden of providing such affirmative evidence. (Bridgestone's Br. 13–15.) Even if such a presumption exists, applying it here would be inappropriate because it is unclear whether Commerce even apprised Xugong that it needed to submit evidence such that

(continued...)

Consol. Court No. 08-00256                                                                    Page 14

each of the fifteen inputs separately and, if necessary, reopen the record to allow the parties to submit relevant information.

## II.     Unrefunded VAT

Titan argues that Commerce acted arbitrarily and illogically in refusing to include the amount of unrefunded VAT in Xugong's normal value calculation. (Titan's Br. 12.) Titan contends that the logic underlying Commerce's inclusion of unrecovered VAT as a cost of production in the "constructed value" of goods produced in market economy ("ME") countries should also apply in nonmarket economy ("NME") cases where NME producers have paid VAT to obtain inputs to produce the goods. (Id. at 12–14.) Titan asserts that because Xugong had paid VAT in acquiring inputs for production of the subject merchandise, and the Chinese government refunded only a portion of the VAT paid, the amount of unrefunded VAT constitutes a cost that Xugong incurred in producing the subject goods and should be included in the normal value calculation.[9] (Id. at 13.) Titan asserts that "strictly as a practical matter no meaningful distinction exists between the ME and NME producers so far as the impact of VAT is concerned." (Id. at 12.) Titan's argument is unavailing.

In ME cases, Commerce determines the normal value of goods by looking at home market sales or, if home market sales are insufficient, at third country sales. See 19 U.S.C.

---

[8](...continued)
Xugong had an opportunity to rebut the presumption. See Transcom, Inc. v. United States, 182 F.3d 876, 883 (Fed. Cir. 1999) (stating that "a party that is subject to the presumption has a right to attempt to rebut it").

[9] Titan claims, and none of the parties dispute, that Xugong paid VAT at [[   ]]% and was refunded [[   ]]%. (See Titan's Confidential Br. 13.)

*Confidential Data Deleted*

Consol. Court No. 08-00256								Page 15

§ 1677b(a)(1)(B)–(C); 19 C.F.R. § 351.404; AIMCOR, 141 F.3d at 1101. If Commerce cannot determine the normal value from home market or third country sales, it uses a "constructed value" of the subject merchandise as the normal value. See 19 U.S.C. § 1677b(a)(4); 19 C.F.R. § 351.405(a). The constructed value is established by applying a statutory formula, and it includes the cost of materials, certain expenses and profits, and packing costs. 19 U.S.C. § 1677b(e). The statute states that the "cost of materials" used in determining the constructed value "shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition which are remitted or refunded upon exportation of the subject merchandise produced from such materials." Id. Based on this statutory language, the Federal Circuit has held that, to the extent VAT paid on inputs has not been recovered by the foreign producer upon exportation of the subject goods, the unrecovered VAT may be included as a cost of materials in the constructed value. See Elkem Metals Co. v. United States, 468 F.3d 795, 802–03 (Fed. Cir. 2006); Camargo Correa Metals, S.A. v. United States, 200 F.3d 771, 774 (Fed. Cir. 1999); AIMCOR, 141 F.3d at 1108–10.

The AD laws distinguish between ME and NME cases. Congress recognizes that NME countries, unlike ME countries, "do[] not operate on market principles of cost or pricing structures, so that sales of merchandise in such countr[ies] do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). Thus, where merchandise is exported from a NME country, Commerce may not be able to calculate the normal value using the methods that it employs in valuing goods from ME countries. See id. § 1677b(c)(1). Where goods are exported from a NME country and available information does not permit normal value calculation using the methods in § 1677b(a), Commerce "shall determine the normal value of the subject

Consol. Court No. 08-00256                                                                                    Page 16

merchandise on the basis of the value of the [FOP] utilized in producing the merchandise." Id. § 1677b(c)(1); see 19 C.F.R. § 351.408(a). Valuation of the FOP is based on "the best available information regarding the values of such factors" in a surrogate ME country or countries. 19 U.S.C. § 1677b(c)(1).

Here, Commerce classified China as a NME country and determined that India was the most appropriate surrogate ME country to use to value the FOP. Final Determination, 73 Fed. Reg. at 40,487. Commerce therefore used Indian surrogate values, rather than actual Chinese costs and prices, in calculating Xugong's normal value. Although Xugong paid VAT to acquire inputs in producing the subject goods, the Chinese VAT system is part of the "cost or pricing structure" of China. Pursuant to the statute, Commerce has determined that elements of the Chinese "cost or pricing structure" should not be used in calculating the normal value, as the elements do not reflect the fair market value of the merchandise. See 19 U.S.C. §§ 1677(18)(A), 1677b(c)(1). Because the surrogate value methodology used here does not rely on Chinese prices and costs, the amount of unrefunded VAT is irrelevant to the normal value calculation.[10]

Further, Xugong's normal value is already tax neutral. The Indian surrogate values used here are exclusive of Indian taxes, Issues and Decision Memorandum at 21, and Commerce's "normal methodology" is to exclude VAT from antidumping calculations involving goods from NME countries, Issues and Decision Memorandum for the Final Results of

---

[10] As to Titan's contention that Commerce uses actual prices paid by NME producers to ME suppliers for inputs to calculate normal value under 19 C.F.R. 351.408(c), the court need not address the propriety of including unrefunded VAT in such a situation. (See Titan's Reply to the United States' and Xugong's Resp. to Titan's Mot. for J. upon the Agency R. 3.) Titan admits that "Commerce used only surrogate values to calculate Xugong's [normal value]; it did not use actual prices paid [to] market-economy suppliers." (Id. at 3 n.2.)

Consol. Court No. 08-00256                                                                         Page 17

Polyethylene Retail Carrier Bags ("PRCBs") from the People's Republic of China ("PRC"), A-570-886, POR 8/1/05-7/31/06, at 4–5 (Dep't Commerce Mar. 10, 2008), available at http://ia.ita.doc.gov/frn/summary/PRC/E8-5300-1.pdf. As the normal value calculation is net of taxes, an adjustment for unrefunded VAT would be inappropriate. See Notice of Final Determination of Sales at Less Than Fair Value: Manganese Metal From the People's Republic of China, 60 Fed. Reg. 56,045, 56,052 (Dep't Commerce Nov. 6, 1995) ("Because the [foreign market value] is net of taxes, neither a downward adjustment to [foreign market value] nor the alternative upward adjustment to [the United States price] suggested by respondents is necessary.") In any event, as the surrogate values used here are independent of the elements of the cost or pricing structures in China, any adjustment for Chinese VAT would be unwarranted. Accordingly, Commerce's refusal to include unrefunded VAT is in accordance with law.

## CONCLUSION

Based on the foregoing, the court remands this matter to Commerce to reconsider whether each of the fifteen inputs was a direct or indirect material, to reopen the record as appropriate, and to recalculate the dumping margin accordingly. If Commerce concludes that the inputs [[                    ]] were direct materials, it should also consider the proper valuation of those inputs.

Commerce shall file its remand determination with the court within sixty days of

*Confidential Data Deleted*

this date. Titan, Bridgestone, and Xugong have eleven days thereafter to file objections, and Commerce will have seven days thereafter to file its response.

                                                /s/ Jane A. Restani
                                                    Jane A. Restani
                                                      Chief Judge

Dated: This 4th day of August, 2009.
       New York, New York.

# NOTICE OF ENTRY AND SERVICE

      This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

      Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

      Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

      Tina Potuto Kimble
      Clerk of the Court

Date: _____  By: _____
                                                           Deputy Clerk